J-S63015-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: ADOPTION OF R.M.S. IN RE: ADOPTION OF D.J.S. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.Q., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 767 WDA 2018 |

Appeal from the Decree April 19, 2018
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): 57 of 2017, 58 of 2017

BEFORE: OTT, J., MURRAY, J., and STEVENS*, P.J.E.

MEMORANDUM BY OTT, J.:                              FILED NOVEMBER 05, 2018

C.Q. ("Mother") appeals from the April 19, 2018 orders in the Court of

Common Pleas of Westmoreland County involuntarily terminating her parental

rights to her daughter, R.M.S., born in August of 2011, and her son, D.J.S.,

born in January of 2014 (collectively, "Children").[1]  Upon careful review, we

affirm.

We summarize the relevant facts and procedural history, as follows.  The

Westmoreland County Children's Bureau ("Agency") received six reports

regarding this family between September 13, 2011, and August 27, 2015,

_____

* Former Justice specially assigned to the Superior Court.

[1] By separate orders dated April 19, 2018, and entered on April 23, 2018, the
orphans' court involuntarily terminated the parental rights of Children's father,
C.J.S. ("Father").  He did not file notices of appeal.

alleging, inter alia, that Mother had mental health needs, including, but not limited to, poor anger management, and was unable to care properly for Children. Trial Court Opinion, 4/19/18, at 3, ¶ 11. On August 27, 2015, the court removed Children from Mother and placed them in the custody of the Agency due to Mother's incarceration for charges involving simple assault and harassment and her subsequent placement in a mental health facility.[2] Id. at ¶ 10; N.T., 4/12/18, at 14, 26. The court adjudicated them dependent on September 15, 2015. Trial Court Opinion, 4/19/18, at 3, ¶ 12.

Children's placement goal was reunification with Mother. Permanency review hearings occurred on February 8, 2016, August 29, 2016, February 27, 2017, August 28, 2017, and February 5, 2018. Id. at 5-6, ¶ 23. At each hearing, the court found Mother to be minimally compliant with her family service plan ("FSP") objectives, which included, in part: obtain a mental health evaluation and follow recommended treatment; cooperate with medication management and take any prescribed medication; complete anger

_____

[2] The certified record does not reveal the victim of Mother's crimes; however, the record indicates that it was either Children's maternal grandmother or their maternal great-grandmother. N.T., 4/12/18, at 32-33. The record reveals that Mother was sentenced to Accelerated Rehabilitative Disposition ("ARD"). Id. at 14. Further, in 2017, Mother was charged with simple assault, terroristic threats, reckless endangerment, and harassment, to which she pleaded guilty. Id. at 15. There is no indication in the record regarding the victim(s) or the sentence Mother received for the most recent crimes.

management counseling; and complete parenting instruction. Id. at 3-4, ¶ 12.

On May 12, 2017, the Agency filed petitions for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8) and (b). The hearing on the petitions occurred on October 12, 2017, December 7, 2017, January 18, 2018,[3] and April 12, 2018. The Agency presented testimony from Marie Wolf-Hatalowich and Tayler Flores, Mother's mental health therapists; Amber Gordon and Angela Sluka, permanency specialists at Project Star who supervised Mother's visits with the Children; and Neil Rosenblum, Ph.D., via telephone, who performed interactional evaluations of Children with Mother and their foster parents. Dr. Rosenblum also performed a mental health assessment of Mother. In addition, the Agency presented the testimony of Carol Hughes, M.A., who conducted therapy between Mother and R.M.S., and Kim Carpinelli, the Agency

_____

[3] Before the testimonial evidence commenced on January 18, 2018, Mother had been in the courtroom, but she was transported to the hospital after telling a caseworker that she "is going to hurt herself." N.T., 1/18/18, at 6, 24. Thereafter, the Agency's counsel made an oral motion for the suspension of Mother's supervised visits with Children, which was then occurring twice per month for 90 minutes. Id. at 8, 51. The orphans' court received testimonial evidence in support of the Agency's motion, and then granted its request pending the next permanency hearing scheduled for February 5, 2018. Id. at 28.

caseworker. Mother, who was represented by counsel, did not present any evidence on her own behalf.[4]

By orders dated April 19, 2018, and entered on April 23, 2018, the orphans' court involuntarily terminated Mother's parental rights. Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5] On May 25, 2018,

_____

[4] Children, who were ages six and four by the conclusion of the termination proceeding, had the benefit of legal counsel as well as a guardian ad litem ("GAL") during the proceeding. See In re T.S., __ A.3d __, 2018 WL 4001825 at * 1 (Pa. 2018) (citing In re Adoption of L.B.M., 161 A.3d 172, 174 (Pa. 2017) (concluding that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, which our Supreme Court has defined as a child's preferred outcome.)

Children's counsel stated on the record in open court that she met with Children, "and their position is that they wish to remain in the foster home. [R.M.S.] was able to express to me that she wants to stay there until she's way old, and that's how she expressed it to me. [D.J.S.] was more engaged in the . . . show on TV, however, he was extremely attached and affectionate to the foster mother. . . ." N.T., 4/12/18, at 41. Children's counsel has also filed an appellee brief in support of the orders involuntarily terminating Mother's parental rights.

In addition, the GAL stated on the record in open court that she has "been on the case since September of 2015 . . . [a]nd [Children] have expressed to me that they want to remain [with their foster parents] and that those are their parents. . . ." Id. The GAL stated to the orphans' court that it was in Children's best interest to terminate Mother's parental rights. Id. at 42.

[5] The record reveals that Mother filed one notice of appeal, which was copied and included in the separate records. We caution Mother that the correct procedure in this instance is to have filed a separate notice of appeal for each child. See Pa.R.A.P. 341, Note ("Where . . . one or more orders resolves issues arising on more than one docket or relating to more than one judgment,

- 4 -

the orphans' court issued an opinion pursuant to Rule 1925(a), wherein it incorporated its opinion accompanying the subject orders.

On appeal, Mother presents the following questions for review:

I.     Whether the [orphans'] [c]ourt erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of Mother under 23 Pa.C.S. § 2511(a)(8)[?]

II.    Whether the [orphans'] [c]ourt erred in finding by clear and convincing evidence that the moving party met [its] burden under 23 Pa.C.S. § 2511(b) that the best interest of the Children are met by terminating Mother's parental rights[?]

Mother's brief at 4 (emphasis in original).

We review Mother's questions under an abuse of discretion standard, as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

_____

separate notices of appeal must be filed."). Further, our Supreme Court has recently held that, in all future cases, the failure to file separate notices of appeal from an order resolving issues on more than one docket will "require[] the appellate court to quash the appeal." Commonwealth v. Walker, 185 A.3d 969, 977 (Pa. 2018). Because Mother filed her notice of appeal before June 1, 2018, when our Supreme Court filed Walker, we do not quash her appeal.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. We have explained as follows.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

The following provisions are relevant in this case:

> (a) General Rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> > (8)    The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> (b) Other considerations.  The court in terminating the rights of a parent shall give primary consideration to the developmental,

- 6 -

physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

We have explained, "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." In re A.R., 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the child welfare agency supplied over a realistic time period. Id.

In addition, this Court has explained that termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of child welfare agency services. In re Adoption of T.B.B., 835 A.2d 387, 396 (Pa. Super. 2003). The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." In re I.J., 972 A.2d 5, 11 (Pa. Super. 2009).

With respect to the "needs and welfare" analysis pertinent to Sections 2511(a)(8) and (b), we have observed:

> [I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

In re Adoption of C.L.G., 956 A.2d 999, 1009 (Pa. Super. 2008) (en banc) (citations omitted).

This Court has explained that the Section 2511(b) analysis involves "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In re C.M.S., 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." Id. (citation omitted). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as

well. Additionally, Section 2511(b) does not require a formal bonding evaluation." In re Z.P., 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." In re K.Z.S., 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

Instantly, in her brief, Mother presents one argument with respect to both issues on appeal. Mother's sole argument is that the testimony of Dr. Rosenblum and Carol Hughes, M.A., does not support the orphans' court's conclusion that terminating her parental rights best serves Children's needs and welfare under Section 2511(a)(8) and (b). With respect to Dr. Rosenblum, Mother asserts that he did not "testify regarding specifics relative to the effect on [C]hildren of permanently severing the bond between" them and Mother. Mother's brief at 8. With respect to Ms. Hughes, Mother baldly asserts that she completed her evaluation in 2016, "thus [it has] no evidentiary value relative to mother-child bond." Id. at 9. Further, she asserts that Ms. Hughes "did not perform a specific assessment of [M]other." Id. at 8. Upon review, we conclude that Mother's assertions are without merit.

Initially, with respect to Section 2511(a)(8), the evidence reveals that Children have been in placement for 28 months, which is far in excess of the 12-month statutory minimum. In addition, the evidence reveals that the

- 9 -

conditions which led to Children's placement continue to exist. Kim Carpinelli, the Agency caseworker, testified, in part, Mother "has made little to no progress with parenting and developing a healthy emotional relationship with the children. She continues to struggle with anger issues and her mental health." N.T., 4/12/18, at 17.

Turning to whether terminating Mother's parental rights will best serve Children's needs and welfare under Section 2511(a)(8) and (b), the orphans' court made the following findings, which the testimonial evidence supports. Children are placed together in a pre-adoptive home, where they have resided since June of 2016. Trial Court Opinion, 4/19/18, at 8, ¶ 37. The female child, R.M.S., then age six, "regularly states that she wants to be adopted." Id. at 8, ¶ 39. The court found the male child, D.J.S., then age four, "is very attached to his foster mother and does not want to leave her side." Id. at ¶ 40. Further, Mother "has made little to no progress with parenting and developing a healthy emotional attachment to" Children. Id. at ¶ 42. In addition, Children "view their foster parents as their mother and father and refer to them as such." Id. at 9, ¶ 41. The court concluded, "testimony indicates that there is little to no bond between [C]hildren and Mother, . . ., but there is a strong[er] bond between [C]hildren and their foster parents." Id. at 10, ¶ 48.

Dr. Rosenblum performed a mental health assessment of Mother in November of 2017. N.T., 12/7/17, at 10. He testified that Mother related an

extensive mental health history stemming from adolescence including depression, which involved "several suicide attempts that have continued into her adulthood. . ., and I think she said borderline personality disorder as well." Id. at 12. Dr. Rosenblum testified that Mother "acknowledged at least three to four suicide attempts over the last year, the last [year] being in 2016." Id. at 13. Dr. Rosenblum testified that his testing confirmed that Mother has major depressive disorder and borderline personality disorder, and that she is at risk for suicide. Id. at 15-20. He opined, "There's no question that she is in need of intensive mental health treatment. I put in my report that I believe she would do well in a partial hospital program. . . . Typically this type of partial program could last for longer than what one would receive in just an inpatient hospitalization alone. . . . It offers a greater opportunity for comprehensive treatment." Id. at 19.

Dr. Rosenblum testified that Mother's two diagnoses "indicat[e] that the prognosis for treatment is more guarded or is going to require a much greater period of time before any therapeutic intervention is going to lead to some success." Id. With respect to how Mother's diagnoses relate to her parenting ability, he testified:

> I would say that [Mother is] highly compromised in her own personal functioning and her ability to respond to the needs of her children. Her ability to even benefit from parenting intervention is highly compromised because of her severe depression and the accompanying severe borderline personality diagnosis that is in existence as well.

Id. at 21.

Dr. Rosenblum also performed an interactional evaluation of Mother and Children in November of 2017. He testified that Mother displayed "significant deficiencies" regarding "her rapport [with Children], her ability to demonstrate parental control, direction, use positive praise and encouragement, [and] set limits when necessary. . . ." Id. at 24.

Based on his observations, Dr. Rosenblum opined that Children do not share a parent-child bond with Mother. Id. at 24, 26. As such, he testified that Children's relationship with Mother is not necessary and beneficial to them. Id. at 27. In this regard, he testified that Children "have already transferred their primary attachments to foster parents," whom he also observed during an interactional evaluation.[6] Id. at 27. Based on the foregoing, we conclude that Dr. Rosenblum's testimony, none of which is contradicted in the record, fully supports the court's conclusion that terminating Mother's parental rights serves Children's needs and welfare pursuant to Section 2511(a)(8), and serves their developmental, physical, and emotional needs and welfare pursuant to Section 2511(b).

Further, in contrast to Mother's contention, we conclude that the testimony of Carol Hughes, M.A., is relevant to the needs and welfare analysis

_____

[6] Dr. Rosenblum testified that he discussed adoption with the older child, R.M.S. When he asked her if she knew what adoption was, "[s]he said it's getting to stay with mommy and daddy[.] [S]he was referring to foster parents. When I asked her why she wanted to do that, she said because she loves them." N.T., 12/7/17, at 25.

regarding R.M.S. under the subject provisions. Ms. Hughes, a psychologist, conducted nine therapy sessions between Mother and R.M.S. from June to November of 2016. N.T., 12/7/17, at 50, 55. When asked on direct examination whether she foresees any problems for R.M.S. if Mother's parental rights are terminated, Ms. Hughes testified:

> Dr. Rosenblum spoke to that and he [is] the individual [who] has the most recent assessment data. My data is stemming from 2016, but given the testimony that I heard, I would not anticipate that this would impair her functioning if parental rights were terminated, that [R.M.S.] would continue her development across all domains.

Id. at 58. Nevertheless, the record does not indicate that a bond between Mother and R.M.S. had developed since Ms. Hughes worked with them in 2016. Therefore, we conclude that her testimony is relevant to the needs and welfare of R.M.S.

Ms. Hughes testified that she conducted "theraplay" between Mother and R.M.S., which she described as "a specialized technique" utilized for treatment of childhood trauma and bonding. Id. at 45. She stated that the purpose of "theraplay" is "essentially trying to help repair a [parent-child] bond. . . ." Id. at 65.

Ms. Hughes initially observed as follows regarding the interaction between Mother and R.M.S.

> [Mother] was inconsistent in her interaction with [R.M.S.]. She was not able to structure [R.M.S.], was not able to effectively elicit cooperation from [R.M.S.] or effectively respond to [R.M.S.]'s behavior. One of the things that was most striking . . . [Mother] oftentimes looked at [R.M.S.] with an angry expression, an

expression of displeasure, rolling her eyes. In my report, I even call it an expression of disgust. At one point during the [initial observation], [Mother's behavior] became so distressing and anxiety producing for [R.M.S.], it's my opinion she couldn't tolerate it anymore and she literally collapsed physically. She threw herself backward on the couch and was quite literally sobbing, and as I said, just threw herself backward getting herself away from [M]other. The end of the session was also significant. . . . I attempted to engage . . . in two Theraplay activities. [R.M.S.] was already too distressed and too dysregulated to really cooperate in any kind of manner. And what ended up happening, as she was crying and [M]other was not able to soothe her in any kind of effective way, mom literally ended up going out the door[,] pushing [R.M.S.] away from her[,] asserting, get away from me. Mother proceeded to go downstairs while [R.M.S.] was left sobbing.

Id. at 49-50. Ms. Hughes opined that Mother "didn't recognize how her parenting style and her interaction with [R.M.S.] was impacting . . . [her] connection with [R.M.S.], that she really didn't recognize the need to change her parenting style and her own parenting pattern." Id. at 52-53. She testified that Mother did not make "any progress whatsoever" by the completion of the nine sessions. Id. at 54.

Ms. Hughes testified that R.M.S. displayed an "insecure ambivalent attachment pattern" with Mother, which she described as stemming "from the inconsistency in the parenting." Id. at 55. She explained, "Dr. Rosenblum had talked about whether the parent is accessible to the child and is responsive to the child's needs. . . . [I]t has to do with the parent not being accessible to the child . . ., [he or she does not] meet the child's needs on a consistent basis." Id. at 55-56. Significantly, Ms. Hughes testified, "[I]nsecure patterns of attachment will impact a child across domains of

development. It will impact them educationally, their own attachment pattern, how they will socialize with other individuals, . . ., their sense of self-esteem, and competence, so it impacts across all domains. Your attachment pattern is your foundation for everything else that's going to come in your life." Id. at 71. We discern no abuse of discretion to the extent that the orphans' court considered the foregoing testimony by Ms. Hughes in terminating Mother's parental rights to R.M.S.

Furthermore, the testimony of Amber Gordon and Angela Sluka, permanency specialists from Project Star, who supervised Mother's visits with Children, demonstrates that terminating Mother's parental rights will serve Children's needs and welfare pursuant to Section 2511(a)(8) and (b). Ms. Gordon testified that, from approximately September of 2015, until February of 2016, Children and Mother displayed affection at the beginning and end of the visits. N.T., 10/12/17, at 53-54. From February of 2016, until May of 2017, which was the last visit Ms. Gordon supervised, she testified that neither Children nor Mother initiated any affection toward each other at the end of the visits. Id. at 54-55, 57. Ms. Sluka, who began supervising the visits in July of 2017, testified on direct examination:

Q. [H]ow does [M]other react when she first sees [Children]?

A. Flat affect.

Q. I'm sorry?

A. A very flat affect.

Q. Does she hug them?  Kiss them?

A. No.

Q. Say hello to them?

A. Yes.  Sometimes.

Q. How do [C]hildren react when it's time to leave?

A. They're ready.  They're at the door.  They're ready to go. . . .

Id. at 96-97.  In contrast, Ms. Gordon and Ms. Sluka testified that, upon returning to their foster parents at the end of supervised visits, Children are very excited, and they run to them, hug them, and kiss them.  Id. at 55-56, 102.

Ms. Gordon and Ms. Sluka described Children's relationship with Mother as that of "friends."  Id. at 63, 100-101.  They testified that Children do not look to her for nurturing or guidance.  Id. at 63-64, 102.  Ms. Gordon testified that Children are "very bonded" to their foster parents.  Further, Ms. Gordon and Ms. Sluka testified that R.M.S. has verbally expressed to them her desire to be adopted.  Id. at 55, 117.  Ms. Gordon and Ms. Sluka testified it would not be detrimental to Children if the court terminated Mother's parental rights. Id. at 65, 102.

Finally, it is important to note the testimony of the Agency caseworker, Ms. Carpinelli, who testified that Children started to have behavioral problems after supervised visits with Mother.  She testified, "they would display behaviors such as . . . arguing or being a little bit resistant or just emotionally

upset for about a week after . . ., and then by the time that they would regulate, they'd have another visit." N.T., 4/12/18, at 19-20. However, since the court suspended Mother's supervised visits in January of 2018, Ms. Carpinelli testified that Children do not display this behavior "at all." Id. at 20. In addition, she testified that Children "do not express that they miss having visits or request to have visits." Id.

The foregoing testimonial evidence overwhelmingly supports the orphans' court's conclusion that terminating Mother's parental rights will serve Children's needs and welfare pursuant to Section 2511(a)(8) as well as their developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). Therefore, Mother's argument on appeal fails. Because we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights, we affirm.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/5/2018